**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| PLUMBERS AND STEAMFITTERS LOCAL 60 PENSION TRUST, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| NIELSEN HOLDINGS PLC, DWIGHT MITCHELL BARNS, JAMERE JACKSON, STEPHEN HASKER AND KELLY ABCARIAN, | ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No.

CLASS ACTION

<u>DEMAND FOR JURY TRIAL</u>

<u>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

## INTRODUCTION

Plaintiff Plumbers and Steamfitters Local 60 Pension Trust ("UA Local 60" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by Nielsen Holdings plc ("Nielsen" or the "Company"), Nielsen's filings with the U.S. Securities and Exchange Commission ("SEC"), and media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Nielsen common stock between February 11, 2016 and July 25, 2018, inclusive (the "Class Period"). The action is brought against Nielsen and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Nielsen provides its customers with analytical data to assist in their comprehensive understanding of what products consumers buy and what programming consumers watch. Nielsen divides its business into two segments: (1) Buy; and (2) Watch. The Company's Buy segment tracks millions of retail transactions around the world and transforms this data into various products that assist consumer packaged goods ("CPG") companies in their marketing decisions. Beginning in February 2015, Nielsen changed its Buy segment presentation to account for the following geographical split: (1) developed markets, such as Europe and the United States; or (2) emerging markets, such as China and Brazil. The

2

Company's Watch segment tracks user data from television, radio, and the internet for customers in the advertising and media sectors. Nielsen relies on data obtained from third-parties such as Facebook and Twitter for many of its products and services.

3.      Nielsen's Buy segment purports to provide retail transactional measurement data, consumer behavior information and analytics primarily to businesses in the consumer packaged-goods industry, utilizing its "extensive database of retail and consumer information" and its "advanced analytical capabilities" to provide "strategic insights that influence [its] clients' key business decisions." As part of the measurement of consumer data, the Company "track[s] billions of sales transactions per month in retail outlets globally and [its] data is used to measure their sales and market share." In 2017, Nielsen's Buy segment generated 49% of the Company's total revenue.

4.      Nielsen's Watch segment "provides viewership and listening data and analytics primarily to the media and advertising industries across the television, radio, print, online, digital, mobile viewing and listening platforms." According to the Company, its Watch data is used by media clients to understand their audiences and establish the value of their advertising inventory. In the Watch segment, ratings are the primary metrics used to determine the value of programming and advertising in the U.S. television advertising marketplace. In 2017, Watch generated 51% of the Company's total revenue.

5.      During the Class Period, Nielsen repeatedly assured investors that its measurement and analytics services provided to customers were continuously viable and strong. However, Defendants' (as defined herein) Class Period statements pertaining to Nielsen's current business and financial condition were materially false and misleading because Defendants failed to disclose that: (1) Buy segment sales were experiencing a permanent decline due to major

budget cuts instituted by the Company's CPG customers; (2) the Company's CPG clients were reducing and cancelling Nielsen custom project work in favor of real-time analytical solutions; (3) the Company recklessly disregarded its readiness for and the true risks of privacy related regulations and policies, including the General Data Protection Regulation ("GDPR"), on its current and future financial and growth prospects; (4) the Company's financial performance was far more dependent on Facebook and other third-party large data set providers than previously disclosed and privacy policy changes affected the scope and terms of access Nielsen would have to third-party data; (5) access to Facebook and other third-party provider data was becoming increasingly restricted for Nielsen and its clients; and (6) as a result, the Company's positive statements about its business, operations, and financial conditions lacked a reasonable basis.

6.     The details underlying Nielsen's struggling business and financial condition began to emerge on October 25, 2016, when Nielsen issued a press release announcing weak results for the third quarter ending September 30, 2016 due primarily to a sharp underperformance in the Company's Buy segment.  The Company also cut guidance, adding that "[b]ased on third quarter performance and our outlook for the remainder of the year in developed Buy, we are updating our 2016 full year guidance for total revenue growth on a constant currency basis to 3.5% - 4.0%, Adjusted EBITDA Margin Growth to 30 basis points, Adjusted Net Income Per Share to $2.73 - $2.79 and Free Cash Flow to approximately $850 million."

7.     On this news, Nielsen's stock price fell $9.28 per share, or 16.89 percent, to close at $45.65 per share on October 25, 2016.

8.     On April 25, 2017, Nielsen issued a press release announcing results for its first quarter ended April 30, 2017.  The Company reported revenue growth within its Watch segment for the quarter, which "increased 10.8%, or 11.1% on a constant currency basis, to $769

million," but revealed a decline in the U.S. for the Buy segment, which "decreased 4.5% to $757 million, or 3.7% on a constant currency basis." The Company added that "Buy revenues in developed markets decreased 8.5%, or 7.3% on a constant currency basis, due to continued softness in our U.S. market." However, despite continued pressure from the developed markets, the Company downplayed the extent of the problems within its Buy segment, remaining optimistic about the prospects of its emerging markets.

9.     On news of continued underperformance in the Buy segment, Nielsen's stock price fell $1.61 per share, or 3.87 percent, to close $39.98 per share on April 25, 2017.

10.     On October 25, 2017, Nielsen issued a press release announcing results for its third quarter ended September 30, 2017. Once again, Nielsen reported revenue growth and margin expansion despite a challenging environment, reporting that "revenues increased 11.2%, or 10.8% on a constant currency basis, as [] global footprint, coverage expansion, and broad product offerings continue to position [the Company] well with both local and multinational clients in these markets." However, despite continued pressure from the developed markets, the Company downplayed the extent of the problem within its Buy segment, remaining optimistic about the prospects of its emerging markets.

11.     On this news, Nielsen's stock price fell $2.57 per share, or 6.25 percent, to close at $38.56 per share on October 25, 2017.

12.     On February 8, 2018, the Company issued a press release announcing results for its fourth quarter and year ended December 31, 2017. Despite hitting its sales target, the Company reported disappointing earnings for the quarter, at a meager $0.23 per share, with projected income well below the mark. The Company attributed the slowdown to pressure from developed markets, particularly U.S. clients who "persist in seeking efficiencies in their own

businesses," with "revenues within the Buy segment for the fourth quarter of 2017 decreased 2.3% to $848 million, or 5.3% on a constant currency basis, compared to the fourth quarter of 2016."

13.     On this news, Nielsen's stock price fell $3.66 per share, or 9.74 percent, to close at $33.90 per share on February 8, 2018.

14.     The full extent of Company's struggling business and financial condition was disclosed on July 26, 2018, when Nielsen announced results for its second quarter ended June 30, 2018.  Specifically, the Company announced downward revisions to EBITDA margin growth, a $0.56 reduction of projected net income, and a $250 million reduction in free cash flow guidance, which was sharply below the guidance issued in April 2018.  Nielsen attributed these disappointing results and projections to the negative impact that the GDPR and other privacy regulations had on its business.   The Company also blamed continued Buy segment underperformance.  Moreover, Nielsen announced that it had opened an in-depth strategic review of its Buy segment and that its Chief Executive Officer would retire at the end of 2018.

15.     On this news, the Company's stock price fell $7.46 per share, or more than 25 percent, to close on July 26, 2018 at $22.11 per share, on heavy volume trading.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Nielsen transacts business in this District, and the Company's offices are located within this Judicial District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

20.     Plaintiff UA Local 60 purchased Nielsen common stock during the Class Period, as set forth in the certification attached hereto, and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

21.     Defendant Nielsen is incorporated in the United Kingdom, with principal executives offices located at Nielsen House, Oxford Business Park South - John Smith Drive, Oxford, OX4 2WB, United Kingdom.  The Company also has a major office at 200 W. Jackson Boulevard, No. 27, Chicago, Illinois, 60606.  The Company's stock is listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "NLSN."

22.     Defendant Dwight Mitchell Barns ("Barns") is and was at all relevant times during the Class Period, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of the Company.

23.     Defendant Jamere Jackson ("Jackson") is and was at all relevant times during the Class Period, Chief Financial Officer ("CFO") of the Company.

24.     Defendant Stephen Hasker ("Hasker") served as the Global President and Chief Operating Officer ("COO") from December 2015 to December 2017.

25.     Defendant Kelly Abcarian ("Abcarian") is and was at all relevant times during the Class Period, Senior Vice President of Product Leadership of the Company.

26.     Defendants Barns, Jackson, Hasker and Abcarian are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Nielsen's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

27.     Nielsen and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Nielsen provides its customers with analytical data to assist in their comprehensive understanding of what products consumers buy and what programming

consumers watch.  Nielsen divides its business into two segments: (1) Buy; and (2) Watch.  The Company's Buy segment tracks millions of retail transactions around the world and transforms this data into various products that assist CPG companies in their marketing decisions. Beginning in February 2015, Nielsen changed its Buy segment presentation to account for the following geographical split: (1) developed markets, such as Europe and the United States; or (2) emerging markets, such as China and Brazil.  The Company's Watch segment tracks user data from television, radio, and the internet for customers in the advertising and media sectors. Nielsen relies on data obtained from third-parties such as Facebook and Twitter for many of its products and services.

29.     Nielsen's Buy segment has developed a niche as the leading solution for CPG analytics with its level of global data collection, tracking billions of packaged goods sales per month.  The Company's Buy data is important to CPG companies that use it to manage advertising campaigns, improve supply chains, and understand their competitive positions with metrics such as market share.

30.     One major trend in the CPG industry that was occurring prior to and during the Class Period was CPG companies' permanent shift away from their usage of custom analytical reports about brand positioning and market reactions and toward products that incorporate data-driven statistics and notifications based on real-time information flows.

31.     The new type of consumer insight leverages real-time data capture (such as bar code scans at check-out) with big data processing and other types of algorithmic computing to provide prompt, actionable recommendations.  As Nielsen's competitors—including the in-house analysis operations of the Company's own clientele—brought these capabilities on line, the demand for traditional custom reports began to wane.

32.     By early 2015, Nielsen started to develop its own real-time data product within the Company's Buy segment.  Dubbed the "Connected Buy System" ("Connected Buy") this new service would operate on a subscription model rather than a per-report purchase model in an attempt to smooth out revenues and increase margins.  Connected Buy was planned to have the capability of collecting real-time data, cleansing the data into a standardized format, and streaming the data to clients.

33.     In December 2015, Nielsen announced that it had been developing the Connected Buy System, but downplayed the importance of this new system.  Rather than a simple extension to the Company's Buy offerings, Connected Buy represented a major strategic shift for Nielsen's Buy segment business.  Ultimately, Nielsen was developing Connected Buy to supplant the permanent loss of traditional sources of revenues in the Buy segment.

34.     Prior and during the Class Period, an increasing number of privacy regulations, including GDPR, were enacted and implemented, which impacted operations of many companies Nielsen relied on, such as Facebook and Twitter. The GDPR was adopted by the European Union on April 2016 and member states had until May 25, 2018 to ensure its rules were fully implemented.  Specifically, the GDPR codified regulation around the collection and usage of personally identifying information, including data that Nielsen has access to and processes from large data sets obtained from Facebook and others partners.  Some key provisions of the GDPR include: (1) requiring the consent of subjects for data process; (2) anonymizing collected data to protect privacy; (3) providing data breach notifications; and (4) safely handling the transfer of data across borders.

**Nielsen's Class Period SEC Filings Did Not Comply with SEC Disclosure Regulations**

35.     Item 7 of Form 10-K and Item 2 of Form 10-Q requires SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  Among other things, Item 303 of Regulation S-K required that Nielsen's Class Period Forms 10-K and 10-Q disclose known events or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

36.     The SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material events or uncertainties. The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

> * * *

> Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

37.     The MD&A disclosures in Nielsen's Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties and trends associated with the growing implementation of zero-based budgeting and a shift from slow reports to fast data, as alleged herein.  These undisclosed

material uncertainties and events, which were then known to management, were reasonably likely to, and did, have a material effect on the Company's future operating results.

38.     As detailed herein, during the Class Period, Nielsen's Forms 10-K and 10-Q made materially false and misleading representations about *potential* reduced discretionary spending risks when, in fact, such risks were *existing* during the Class Period.  In addition, Defendants failed to disclose a major shift away from custom analytical reports about brand positioning and market reactions and toward data-driven statistics and notifications based on real-time information flows.

39.     Further, Item 9A of Form 10-K and Item 4 of Form 10-Q requires SEC registrants to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], Disclosure Controls and Procedures. Item 307 of Regulation S-K required Nielsen's Class Period Forms 10-K and 10-Q to disclose Defendant Barns' and Defendant Jackson's conclusions about the effectiveness of Nielsen's disclosure controls, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

40.     During the Class Period, Nielsen falsely and misleadingly represented in the Forms 10-K and 10-Q it filed with SEC that its disclosure controls were operating effectively when they were not, as detailed herein.  These false and misleading representations were then fraudulently certified by Defendant Barns and Defendant Jackson, as set forth herein.

**Materially False and Misleading Statements Issued During the Class Period**

41.     The Class Period begins on February 11, 2016, when the Company held a conference call with analysts and investors to discuss financial results for its fourth quarter and year ended December 31, 2015.  During the call, Nielsen executives discussed positive trends in the Buy Segment and offered 2016 guidance.  Defendant Barns stated in part:

Turning to buy, as we closed 2015, our buy business continued to strengthen and expand. Revenues grew nearly 6% in the quarter, led by emerging markets, as well as a solid growth in key developed markets including the US and Europe. We continued to win new clients in the relatively faster growing mid-tier and small client segments…. We also continued to strengthen our positions with retailers around the world. Retailers are long time data partners for Nielsen but they also have a growing need for our analytics to help with their advertising, marketing, and merchandising decisions, both online and offline. Our business with retailers saw strong growth in 2015, boosted in part by 40 new ecommerce clients worldwide.

\*\*\*

Emerging markets grew 8.4% in Q4, despite more challenging economic conditions in many key markets…. Revenues increased 4.8% in Q4. And notably this was helped by Europe, where we're starting to see growth at the region level, low single-digits, but growth and we're happy to have it…. Developed markets also exited the year with good momentum. Revenues increased 4.8% in Q4. And notably this was helped by Europe, where we're starting to see growth at the region level, low single-digits, but growth and we're happy to have it.

In addition, Defendant Jackson assured investors that discretionary spending from its clients was "stable," contributing to growth in the Buy segment:

[W]e see the **discretionary spend environment as being pretty stable**. We see our **clients investing in analytics and innovation** to help them drive top line growth. And you've seen from **a number of CPG clients, as they've come out of a restructuring cycle, that they're pivoting to growth** by investing in innovation…. So **we feel very good about where we are in the cycle**, and our clients are starting to see some growth.[1]

42.     On February 19, 2016, Nielsen filed with the SEC its Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K"), signed by Defendants Barns and Jackson. The 2015 Form 10-K contained false and misleading MD&A, risk factor and disclosure control disclosures, as well as certification thereon by Defendants Barns and Jackson.

43.     The MD&A disclosure included in the 2015 Form 10-K was material false and misleading because it failed to disclose the effects of known trends and uncertainties that were then having, and were reasonably likely to continue to have, a material effect on the Company's

---

[1] Unless otherwise noted, all emphasis is added.

operating results, including those trends and uncertainties associated with reduced discretionary spending from Nielsen's CPG customers.

44. The risk factor disclosure included in the 2015 Form 10-K deceptively referred to *potential risks* associated with reduced discretionary spending by the Company's CPG customers, when, in fact, such risks had *already materialized*, stating, in pertinent part, as follows:

> Continued adverse market conditions, particularly in the consumer packaged goods, media, entertainment, telecommunications or technology industries, could adversely impact our revenue.
>
> A number of adverse financial developments continue to impact the global financial markets. The current economic environment has witnessed continued malaise in consumer confidence and demand, impacting the demand for our customers' products and services. *Those reduced demands <u>could</u> adversely affect the ability of some of our customers* to meet their current obligations to us and hinder their *ability to incur new obligations* until the economy and their businesses strengthen. The inability of our customers to pay us for our services and/or decisions by current or future customers to forego or defer purchases may adversely impact our business, financial condition, results of operations, profitability and cash flows and may continue to present risks for an extended period of time. We cannot predict the impact of economic slowdowns on our future financial performance.
>
> We expect that revenues generated from our measurement and analytical services will continue to represent a substantial portion of our overall revenue for the foreseeable future. *To the extent the businesses we service, especially our clients in the consumer packaged goods, media, entertainment, telecommunications and technology industries, are subject to the financial pressures of, for example, increased costs or reduced demand for their products, the demand for our services, or the prices our clients are willing to pay for those services, <u>may decline</u>.*
>
> During challenging economic times, *clients, typically advertisers, within our Buy segment <u>may reduce their discretionary advertising expenditures</u> and <u>may be less likely to purchase our analytical services, which would have an adverse effect on our revenue</u>.*
>
> Clients within our Watch segment derive a significant amount of their revenue from the sale or purchase of advertising. During challenging economic times, advertisers may reduce advertising expenditures and advertising agencies and

other media may be less likely to purchase our media information services, which would have an adverse effect on our revenue.

45.     The 2015 Form 10-K also contained false and misleading representations about

Nielsen's disclosure controls, stating, in pertinent part, as follows:

**Item 9A. Controls and Procedures**

(a) Evaluation of Disclosure Controls and Procedures

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that the Company files or submits to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, as the Company's disclosure controls and procedures are designed to do.

***

There have been no changes in the Company's internal control over financial reporting that occurred during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

46.     The representations in the 2015 Form 10-K about Nielsen's disclosure controls

were then falsely and misleadingly certified by Defendants Barns and Jackson:

I, [Defendants Barns and Jackson], certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2015 of Nielsen Holdings plc;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

15

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

16

      b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47. The above noted material misstatements and omissions in the Form 10-K failed to disclose material facts required by SEC rules and regulations associated with the growing implementation of zero-based budgeting and a shift from slow reports to fast data, as alleged herein. These material misrepresentations and omissions in the Form 10-K, including the certifications by Defendants Barns and Jackson, were repeated, in all material respects, in the Forms 10-Q that Nielsen filed with the SEC throughout the remainder of the Class Period.

48. On April 20, 2016, Nielsen issued a press release announcing financial results for the first quarter ended March 31, 2016. In the press release, Nielsen reiterated positive growth and trends in the Buy Segment, stating in relevant part:

> "Nielsen's strong first quarter results were underpinned by our steady and resilient business model, which drove 5.2% constant currency revenue growth, continued margin expansion and strong earnings growth. Fueled by 10.0% growth in emerging markets and growing momentum with retailers globally, our Buy segment grew 4.3% on a constant currency basis".... said Mitch Barns, Chief Executive Officer at Nielsen.
>
>                        ***
>
> Buy revenues in developed markets grew 2.0% on a constant currency basis due to modest strength in Europe and continued traction with retailer clients.

49. On that same day, the Company held a conference call with analysts and investors to discuss results for its first quarter ended March 31, 2016. During the call, Defendant Barns continued to reiterate positive growth in the Company's Buy segment, stating in relevant part:

> 2016 is off to a good start for Nielsen, underpinned by our consistent resilient business model. Our strong financial results in the first quarter were fueled by our Watch segment's progress with Total Audience measurement, and ***our Buy segment's continued strength in emerging markets and growing momentum with retailers.*** In both Watch and Buy, our teams are executing well. And there's a lot to look forward to for the rest of the year and beyond.

But I'd like you to take away from this quarter's call is that we continue to deliver consistent growth and profitability, all while managing through the ongoing changes occurring in the markets we serve.

\*\*\*

In Buy segment, revenues increased 4.3% on a constant currency basis. In emerging markets, we're again the significant growth driver in the quarter with revenues up 10%. These markets experience volatility from time to time. But with it also comes tremendous growth opportunity. With our unmatched global footprint, supported by the investments we made in coverage for these markets over the past several years, we love our position. This quarter our teams once again executed well, and we saw solid growth with multinational and local clients as they invested in those measurements and analytics.

In developed markets, revenues grew 2% with our core measurement business remaining rock solid. We saw growth shoots in Europe for the second quarter in a row, which is encouraging and also a huge testament to the efforts of our teams and their solid execution.

Defendant Jackson also reiterated positive growth in the Company's Buy segment, stating in relevant part:

Turning to Buy. Our business had a solid first quarter. First quarter total Buy revenue was $793 million, up 4.3% on a constant currency basis. Our business in the developed markets was $550 million, up 2% on a constant currency basis. And our business in the emerging markets was $243 million, up 10% on a constant currency basis. Our teams are continuing to execute in line with the guidance framework we gave for 2016.

*In the developed markets, our core measurement business was solid* in our two largest markets: the U.S. and Western Europe. We *also saw a broad-based growth in the emerging markets* with double-digit growth in Latin America, China and Southeast Asia along with mid to high single digits in Eastern Europe and Africa. Overall *discretionary spend remained stable with relative strength* in areas like innovation.

50.     On July 26, 2016, the Company held a conference call with analysts and investors to discuss financial results for its second quarter ended June 30, 2016.  During the call, Defendant Jackson downplayed the softness with discretionary spending for the quarter, reiterating growth, stating:

[Analyst]: Can you provide a little more color on the trends in the Buy business particularly in developed regions? It seems like the 90 basis points of constant currency growth in developed is the slowest we've seen in a number of quarters. I know you called out more pressure on discretionary spending trends in the quarter, but *is there anything else worth calling out?* And as we look to the full year, should we expect, ***should we still expect that 1.5% to 3.5% growth?***

[Defendant Jackson]: For Nielsen, the U.S. and Europe represents over 85% of our developed markets. Europe actually saw a modest growth in core measurement, while the discretionary side was a little soft as was in the U.S. And, I'll just remind you that discretionary spending can be a little lumpy. We're coming off two stable quarters, so ***it's not uncommon to see these dynamics from time to time. And in the second half, I expect developed Buy to be within the range we gave at Analyst Day of 1.5% to 3.5%.***

\*\*\*

[Analyst]: The discretionary spending slowdown, if that's the right word in Q2, I think, Jamere, you were saying that was really just something of a blip and maybe there were some tough comps*. Is this not something to worry about?* And I would mention this because this has been an item to worry about in previous reporting periods for you.

[Defendant Jackson]: So, just to reiterate my comments on the discretionary portion of the business, as I said. We saw modest growth in core measurement and the discretionary side was a little soft in the developed markets, both in the U.S. and the UK. What I've always reminded you of is that discretionary spend can be a little lumpy, we're coming off a couple of stable quarters. So, ***it's not uncommon to see these dynamics from time to time. And in the second half, we expect developed Buy to be within the range that we gave at Analyst Day, 1.5% to 3.5%.***

51.     The statements contained in ¶¶ 41-50 were materially false and/or misleading when made because Defendants failed to disclose that: (1) Nielsen's sales were experiencing a permanent decline due to major budget cuts instituted by the Company's CPG customers; (2) the Company's CPG clients were reducing and cancelling Nielsen custom project work in favor of real-time analytical solutions; and (3) as a result, the Company's positive statements about its business, operations, and financial conditions lacked a reasonable basis.

52.     On October 25, 2016, Nielsen issued a press release announcing weak results for its third quarter ended September 30, 2016 due primarily to a sharp underperformance in the

Company's Buy segment. The Company also cut guidance, adding that "[b]ased on third quarter performance and our outlook for the remainder of the year in developed Buy, we are updating our 2016 full year guidance for total revenue growth on a constant currency basis to 3.5% - 4.0%, Adjusted EBITDA Margin Growth to 30 basis points, Adjusted Net Income Per Share to $2.73 - $2.79 and Free Cash Flow to approximately $850 million."

> [Defendant] Barns continued, "In the Buy segment, while emerging markets continued to produce top-line growth, *our results in the developed markets were disappointing, particularly in the U.S.* Many of our clients are seeking efficiency and productivity in the face of a challenging growth environment.

53. On that same day, the Company held a conference call with analysts and investors to discuss third quarter 2016 financial results. During the call, Defendant Barns admitted that CPG companies were shifting away from the Company's business model and the impact it would have on the Buy segment, stating in part:

> In developed markets, specifically the U.S., the environment in which we operate has become more challenging. Large global manufacturers are the strength of our client base. And as I'm sure you've seen in the recent press, they found it increasingly difficult to achieve growth in markets with growing fragmentation in consumer demand, more competition from smaller and local players and increased commodity pricing.
>
> Together, these factors have led them to seek efficiencies in productivity in their business and our business has not been immune. Our clients continue to value our core measurement services, especially given the growing product and retail fragmentation in the market. But, when it comes to analytics, their needs have been shifting, *clients are shifting away from custom insights* delivered via deep-dive projects, and they are shifting toward every day analytics, often called activation, delivered directly to multiple end users.
>
> *Our view is that this is a secular shift, not a passing phase or a cycle that will swing back.*

54. During that same call, when one analyst asked about the quarter-over-quarter change, Defendant Jackson acknowledged that Nielsen management saw weak and deteriorating discretionary spending by its clients on Insights projects since late 2015, stating:

[Analyst]: "I'm just a little confused quite honestly on what changed over the quarter?"

[Defendant Jackson]: So, a couple things. First of all, if you're **looking back to the third quarter of last year,** you saw our developed markets business grow 4.8% constant currency and as part of that discussion **we've said that we saw a pretty strong discretionary environment. We have not seen that since then** and if you look at **our results in our developed Buy business they've sequentially been going in the other direction** and part of that is because that stable or I would say the **environment in the third quarter last year actually ran a little hot**.

55.     Following these disappointing quarter results, Nielsen's stock price fell $9.28 per share, or 16.89 percent, to close at $45.65 per share on October 25, 2016.

56.     On December 8, 2016, the Company held its Fourth Annual Analyst Day to present financial update and outlook for the year.  During the  presentation, the Company stated the following regarding growth in its Buy segment:

[Defendant Barns]: By the end of 2016, we expect emerging markets to add up to more than $1 billion in total global revenues. We expect 2017 to be another good growth year for our business in emerging markets.

*** 

[Defendant Hasker]: [W]here is the growth occurring? Well, obvious point to everyone, emerging markets growing faster double or more developing markets growth, and you see that reflected in our growth over the last three to four years 8% and a bit compared to 2% in the emerging markets compared to the developed markets. Developed for us is North America, it's Australia, New Zealand and Western Europe.

*** 

[Defendant Barns]: First, in our Buy business, I **want to just reiterate, emerging markets continues to be very solid, high single-digit growth**. Developed markets, 2017 will be a bit of a transition year, in particular for our U.S. business. But it's a transition that leads to a stronger, higher margin business. And as Steve Hasker showed with his slide, it's not only a stronger higher margin business, but the way we're going about navigating through that transition, it's a transition that takes us to a much bigger pie of opportunity. So, it's going to be well worth it. Certainly, well worth it for us, we believe well worth it for all of our investors as well.

57.     On February 9, 2017, Nielsen reported financial results for its fourth quarter and year ended December 31, 2016.  Despite some deceleration in emerging markets and pressure

from developed markets, Nielsen issued optimistic full year 2017 guidance, with "expect[ed] total company revenue growth to be 5% to 6%," maintaining "2017 EPS guidance" and raising "free cash flow guidance to approximately $900 million." The Company also downplayed deceleration issues within its Buy segment, by attributing slowdowns to its developed markets while touting growth in its emerging markets.

58. On the same day, during a conference call with analysts and investors to discuss full-year results for 2016, the Company made optimistic statements regarding its Buy segment despite a tougher environment likely to impact its 2017 results. Defendant Barns stated in relevant part:

> But first, emerging markets. We have a compelling story in emerging markets. As a global company with a footprint in over 100 markets, we have a strong position in the markets that are growing the fastest. This is a significant competitive advantage. Our balanced portfolio of global and local clients, ongoing investments in better coverage and granularity for our measurement products, and *the healthy demand for our broad range of analytics offerings will continue to drive growth in this part of our business, which accounts for nearly one-third of our total Buy revenues.*

59. On April 25, 2017, Nielsen issued a press release announcing results for its first quarter ended March 31, 2017. The Company reported revenue growth within its Watch segment for the quarter, which "increased 10.8%, or 11.1% on a constant currency basis, to $769 million," but revealed decline in the U.S. for the Buy segment, which "decreased 4.5% to $757 million, or 3.7% on a constant currency basis." The Company added that "Buy revenues in developed markets decreased 8.5%, or 7.3% on a constant currency basis, due to continued softness in our U.S. market." However, despite continued pressure from the developed markets, the Company downplayed the extent of the problem within its Buy segment, remaining optimistic about the prospects of its emerging markets.

60.     On that same day, the Company held a conference call with analysts and investors to discuss results for its first quarter ended March 31, 2017. During the call, the Company remained optimistic about the prospects of its Buy segment, particularly in emerging markets, stating in relevant part:

> [Defendant Barns]: In Buy, we see continued strength in emerging markets. We are driving productivity to mitigate the difficult growth environment in the U.S. We continue to invest in coverage and we are executing well on our development of the Connected System.
>
> ***
>
> [Defendant Jackson]: Turning to Buy, we have talked extensively for the past few quarters about how we were planning for a tougher environment in developed markets and the ongoing strength in emerging markets.
>
> ***
>
> [Defendant Jackson]: We continue to see robust growth in emerging Buy markets and we continue to plan for a tougher environment and developed Buy markets.
>
> ***
>
> [Defendant Jackson]: We *see good momentum in the emerging markets*, particularly because of the strength with both locals and those same *multinational clients* that quite frankly are driving the Buy business down in the U.S. are *actually spending more in the emerging markets.*

61.     On this news, Nielsen's stock price fell $1.61 per share, or 3.87 percent, to close at $39.98 per share on April 25, 2017.

62.     On July 27, 2017, the Company held a conference call with analysts and investors to discuss results for the second quarter ended June 30, 2017. During the call, the Company remained optimistic about the prospects of its Buy segment, particularly in emerging markets, stating in relevant part:

> [Defendant Jackson]: Our business in the emerging markets remains robust. Revenue was $296 million, up 10% constant currency. The bets we have made to expand coverage and services are delivering broad based growth with both multinationals and locals. Once again, we saw strong growth in Latin America, Southeast Asia, Eastern Europe and Greater China. In addition, margins in our emerging markets are expanding as we gain scale in key markets.

***

[Defendant Jackson]: And as we look at 2017 revenue growth, a few dynamics are playing out: one, our Watch business remains solid; two, we **continue to see robust growth in the emerging markets**; and three, we continue to plan for a tough U.S. market….

However, a review of our revenue pipeline for 2018, which includes renewals and new business, suggests an **improvement in our business in 2018**. This, along with an improving market environment, suggests a **return to flat revenue in developed Buy for the full year for 2018** versus 2017.

63. On October 25, 2017, Nielsen issued a press release announcing results for its third quarter ended September 30, 2017. Once again, Nielsen reported revenue growth and margin expansion despite a challenging environment, reporting that "revenues increased 11.2%, or 10.8% on a constant currency basis, as [] global footprint, coverage expansion, and broad product offerings continue to position [the Company] well with both local and multinational clients in these markets." However, despite continued pressure from the developed markets, the Company downplayed the extent of the problem within its Buy segment, remaining optimistic about the prospects of its emerging markets.

64. On the same day, the Company held a conference call with analysts and investors to discuss results for the third quarter ended September 30, 2017. During the call, the Company remained optimistic about the prospects of its Buy segment, particularly in emerging markets, stating in relevant part:

[Analyst]: I actually just to clarify some earlier comments around the developed markets Buy business. Last quarter I left with the impression that your expectations for growth in 2018 were to be relatively flat and so on this call I heard that maybe you're looking at trends to continue to improve year-over-year. There seems to be a delta in my mind for that give that the developed markets is down roughly about 4.5% year-to-date, so between 0% to 4.5%. Any additional color on that?

[Defendant Barns]: Yeah, so again as I said, we'll share more details when we give our 2018 outlook in a couple of weeks. We do expect Developed Buy to down less in 2018 and 2017 and as I said in my opening comments, the U.S. is

24

actually improving; fundamentals are improving, although the environment there remains challenging.

Again there are three things that we feel very good about heading into next year, it's our wins with retailers and manufacturers. As we go through our operating plans we are looking at our contract renewals with our large global manufacturers. We are renewing all of those at 100%. I think the environment there is getting better. The Connected System has given us incremental capabilities to sell in. We'll see some incremental revenue from the Connected Partner program. So those three things are the dynamics that will help us drive improving trends in 2018.

65.     On this news, Nielsen's stock price fell $2.57 per share, or 6.25 percent, to close at $38.56 per share on October 25, 2017.

66.     On February 8, 2018, before the market open, the Company issued a press release announcing its fourth quarter and fiscal year 2017 financial results.   Despite disappointing GAAP profits for the quarter, the Company continued to tout strong growth within the Company, specifically in the Watch and Buy's emerging market segments, and increased fourth quarter EBITDA as compared to fourth quarter 2016.   The Company also provided full year financial guidance including Adjusted EBITDA margin growth of ~60 basis points and free cash flow of $800 million:

> **New York, USA – February 8, 2018** – Nielsen Holdings plc (NYSE: NLSN) today announced its fourth quarter and full year 2017 results. Revenues were $1,761 million for the fourth quarter of 2017, up 6.3%, or 4.2% on a constant currency basis, compared to the fourth quarter of 2016. Revenues were $6,572 million for the full year of 2017, up 4.2%, or 3.8% on a constant currency basis compared to 2016.
>
> "We executed well on our key initiatives in Watch and Buy while contending with rapidly changing markets in 2017. In 2018, we'll continue to invest in innovation to drive growth and efficiency as we proceed on the path towards 2020," said Mitch Barns, Chief Executive Officer of Nielsen.
>
> Barns continued, "***In Watch, we had a strong year.*** Our teams were relentless in their efforts to enhance our Total Audience Measurement system and drive client adoption across all of its components. As the market further evolves due to ongoing media fragmentation, Total Audience Measurement will serve as the

25

foundation for our future, providing the measurement capability, scale, and flexibility necessary to best meet our clients' needs. In Buy, *we remain well positioned in Emerging Markets due to our investments in coverage* and our balanced client portfolio. In Developed Markets, the U.S. remains under pressure as clients persist in seeking efficiencies in their own businesses in a difficult growth environment. We continue to drive the rollout of the Connected System and increase coverage and granularity within our Total Consumer initiative, both of which will enable us to drive growth for Nielsen and our clients despite the environment."

***

### Fourth Quarter 2017 Operating Results

Revenues within the Watch segment for the fourth quarter of 2017 increased 15.9% to $913 million, or 14.8% on a constant currency basis, compared to the fourth quarter of 2016. Excluding the acquisition of Gracenote completed on February 1, 2017, Watch revenues increased 7.4%, or 6.4% on a constant currency basis. Audience Measurement of Video and Text revenues increased 20.6%, or 19.2% on a constant currency basis. Excluding the acquisition of Gracenote, Audience Measurement of Video and Text revenues increased 7.7%, or 6.5% on a constant currency basis, primarily due to our ongoing investments and continued client adoption of our Total Audience Measurement system. Audio revenues increased 9.2% on a reported and constant currency basis for the fourth quarter of 2017 due to timing of deliveries. Marketing Effectiveness revenues increased by 36.1%, or 32.9% on a constant currency basis, driven by continued strength in our product initiatives, including data deliveries and consistent investment in our product portfolio. Other Watch revenues decreased 34.8%, or 33.8% on a constant currency basis, due to continued portfolio pruning.

Revenues within the Buy segment for the fourth quarter of 2017 decreased 2.3% to $848 million, or 5.3% on a constant currency basis, compared to the fourth quarter of 2016. Buy emerging markets revenues increased 7.4%, or 4.8% on a constant currency basis, as our global footprint, coverage expansion, and broad product offerings continued to position us well with both local and multinational clients in these markets….

Net income for the fourth quarter of 2017 decreased 49.1%, or 50.6% on a constant currency basis, to $81 million, compared to $159 million in the fourth quarter of 2016. Net income per share on a diluted basis was $0.23 per share, compared to $0.44 for the fourth quarter of 2016. During the fourth quarter of 2017, the company recorded a provisional non-cash tax charge of $104 million, or $0.29 per share. Excluding this expense, net income per share on a diluted basis was $0.52 per share, an increase of 18.2% percent year-on year, as referenced in the "Certain Non-GAAP Measures" section. The provisional tax charge was incurred as a result of the recently enacted Tax Cuts and Jobs Act ("TCJA") and

includes a one-time repatriation tax. This provisional amount is subject to adjustment during a measurement period of one year following the enactment of TCJA, as provided by recent Securities and Exchange Commission ("SEC") guidance.

Adjusted EBITDA for the fourth quarter of 2017 increased 5.7%, or 3.8% on a constant currency basis, to $579 million, compared to the fourth quarter of 2016. Adjusted EBITDA margins contracted 21 basis points, or 14 basis points on a constant currency basis, to 32.9%, due to our investments in growth and efficiency initiatives.

***

**Financial Position**

As of December 31, 2017, Nielsen's cash and cash equivalents were $656 million and gross debt was $8,441 million. Net debt (gross debt less cash and cash equivalents) was $7,785 million and our net debt leverage ratio was 3.83x at the end of 2017. Net capital expenditures were $447 million for the full year of 2017, compared to $391 million in 2016. Cash taxes were $232 million for the full year of 2017, compared to $157 million in 2016.

Cash flow from operations increased to $1,310 million for the full year of 2017, from $1,296 million in 2016. Free cash flow for the full year of 2017 decreased to $863 million, compared to $941 million in 2016. Cash flow performance was driven by higher Adjusted EBITDA, offset by higher cash taxes, interest and net capital expenditures.

***

**2018 Full Year Guidance**

The company is maintaining its full year guidance as highlighted below:

- Total revenue growth on a constant currency basis: ~3%
- Adjusted EBITDA margin growth on a constant currency basis: ~(60)bps
- ***GAAP net income per share: $1.40 - $1.46***
- Free cash flow: ~$800 million

67. On that same day, the Company held a conference call with analysts and investors to discuss fourth quarter and fiscal year 2017 financial results. During the call, in addition to reiterating the financial metrics stated in the press release, defendants assured the market that the Company was ready for the upcoming effective date of the GDPR and that the new law was not impacting and would not have any impact on its business and Nielsen would still have access to all the data needed to provide services to its clients:

**Brian W. Wieser - Pivotal Research Group LLC**

*I was wondering if you could talk about how GDPR might be impacting or might impact the business* in Europe in the coming year? I can imagine it might be helpful for panels. I'm curious how it might impact eXelate or Nielsen Marketing Cloud more generally. Love to hear your thoughts on both of those. Thank you.

**Dwight Mitchell Barns - Nielsen Holdings Plc**

*GDPR, we've been focused on this for some time. We have a big team that's working on it. We've been out in front of it. We're ready. We don't see any significant impact for our Buy business.* For Watch, there'll be some things that we'll have to do to ensure our compliance with the regulations, but it's manageable. *We don't expect to see any major impact on our business. We'll still have access to all the data that we're going to need for our products. So, yeah, we're in good shape.*

68.　　On this news, Nielsen's stock price fell $3.66 per share, or 9.74 percent, to close

at $33.90 per share on February 8, 2018.

69.　　On April 26, 2018, the Company issued a press release announcing the financial

results for the first quarter 2018.  The press release highlighted the growth in the Company's

Watch segment including strong growth in Audience Measurement:

> Nielsen Holdings plc today announced its first quarter 2018 results. Revenues were $1,610 million for the first quarter of 2018, up 5.5%, or 2.4% on a constant currency basis, compared to the first quarter of 2017.
>
> ***
>
> 　　Revenues within the Watch segment for the first quarter of 2018 increased 8.5% to $834 million, or 7.1% on a constant currency basis, compared to the first quarter of 2017. Audience Measurement of Video and Text revenues increased 12.0%, or 10.5% on a constant currency basis, primarily due to our ongoing investments and continued client adoption of our Total Audience Measurement system. Audio revenues increased 0.8% on a reported and constant currency basis for the first quarter of 2018. Marketing Effectiveness revenues increased 24.6%, or 22.7% on a constant currency basis, driven by consistent investment in our product portfolio and continued strength in our product initiatives. Other Watch revenues decreased by $16 million, or 32.7% on a reported basis and 35.3% on a constant currency basis, due to continued portfolio pruning.

Revenues within the Buy segment for the first quarter of 2018 increased 2.5% to $776 million, compared to the first quarter of 2017. On a constant currency basis, Buy segment revenues decreased 2.1%, compared to the first quarter of 2017. . . . On a constant currency basis, Buy revenues in developed markets decreased 5.2% compared to the first quarter of 2017, due to continued softness in our U.S. market. Revenues in Corporate Buy decreased by $8 million, or 42.1% on a reported and constant currency basis, primarily due to continued portfolio pruning.

Net income for the first quarter of 2018 increased 1.4% to $72 million, compared to $71 million in the first quarter of 2017, as higher revenues were partially offset by our retailer investments and other growth initiatives. Net income was flat on a constant currency basis. Net income per share on a diluted basis was $0.20 per share for each of the first quarters ended 2018 and 2017.

Adjusted EBITDA for the first quarter of 2018 increased 0.7% to $423 million, compared to the first quarter of 2017. Adjusted EBITDA decreased by 0.7% on a constant currency basis. Adjusted EBITDA margins contracted 125 basis points to 26.3%, or 83 basis points on a constant currency basis, due to our retailer investments and other growth initiatives.

\*\*\*

**2018 Full Year Guidance**

To reflect the expected impact of the Tax Cuts and Jobs Act of 2017 ("TCJA"), the Company has increased its 2018 GAAP net income per share guidance range by $0.10 per share to a range of $1.50 to $1.56. The company expects its 2018 effective tax rate to be ~34%.

- GAAP net income per share: Revised        Original
                             $1.50-$1.56     $1.40-$1.46

The company's other full year guidance is unchanged from amounts previously provided, as indicated below:
- Total revenue growth on a constant currency basis: ~3%
- Adjusted EBITDA margin growth on a constant currency basis:~(60)bps
- Free cash flow: ~$800 million

70.    On the same day, the Company held a conference call for analysts and investors to discuss the first quarter financial results.  During the call defendants reiterated the first quarter 2018 financial results reported in the press release and assured investors that the Company was currently on track to meet fiscal year 2018 financial guidance, including $800 million in free

cash flow, by the end of 2018. The Company added another assurance that privacy policy changes by its large data partner, Facebook, would have no impact on its access to data and that the GDPR, despite increased consumer privacy protections, would be a "net positive" for the Company:

> [Defendant Jackson]: *We remain on track for 60 basis points of margin compression in 2018* on a constant currency basis with improving trends in the second half as our Buy growth initiatives ramp.
>
> * * *
>
> [Defendant Barns]: In March, Facebook announced policy changes, limiting the availability of third-party datasets for audience targeting on their platform. While access for some firms was curtailed, our relationship with Facebook remains strong. *We still have access to the data that the industry needs for independent third-party measurement*. . . .
>
> *Another key focus of the industry has been the General Data Protection Regulation, or GDPR, a new EU data protection law going into effect on May 25. We're ready for this. Because we've been at the forefront of privacy compliance for years, many of the steps required by GDPR were already in place. Overall, we see the greater focus on privacy, including GDPR, as a net positive for our position in the marketplace.*

71. During the April 26, 2018 call, one analyst asked defendants an even more specific question about the Company's ongoing relationship with Facebook and whether the Company continued to have the same level of access to Facebook data that it had previously. Defendant Barns stated that the Company still had access to the data it needed to provide services necessary to deliver all management services to its clients, even if there were some "process" changes being made:

> [Analyst]: I just wanted to follow up on the Facebook commentary and see if there's any additional color that you could provide. It sounded like the relationship is obviously very strong and still intact. But has *there been any change in perhaps the level of data that you're able to get at this point in terms of segmentation that you have access to?* . . .
>
> [Defendant Barns]: As you mentioned, it is a very long-running and very strong relationship that we have with Facebook. *We still have access to the data we need for our measurement products. For some of our products, the analytics*

*products, we've had to make some process changes. We are in the process of making some process changes in order to accommodate some of their policy changes. But we're still able to deliver all those products to our clients in the marketplace and we don't see any change in that going forward. I think one of the reasons why we've weathered this period especially well, relatively well, better than, I think, a lot of the other data partners with Facebook, is because we've always taken a more conservative approach with regard to consumer data protection, consumer data privacy. . . . So yes, again we're in a very good position. I think as we think about the implications of the Facebook situation and the implications of GDPR, we really think all of this plays as a net positive for our business and our position in the marketplace as it unfolds.*

During the call, the Company remained optimistic about the prospects of its Buy segment, particularly in emerging markets, stating in relevant part:

[Defendant Jackson]: First, let me give a few more details on our total company performance in the first quarter. On the left side of the page are our results on a U.S. GAAP basis. Revenue was just over $1.6 billion, up 5.5% on a reported basis, driven by solid growth in our Watch segment and the emerging markets in Buy.

\*\*\*

[Defendant Jackson]: [O]ur Watch business has great momentum and we continue to invest. We also saw improving results in emerging Buy markets. We are making solid progress on our growth initiatives with the Connected System and retailer program, however, continue to operate in a challenging U.S. Buy market.

\*\*\*

[Defendant Barns]: To summarize the picture for our Buy segment, while the operating environment remains challenging in developed Buy, especially in the U.S., *we're making real progress towards returning to growth and improving profitability despite the environment*, in line with our Path to 2020 plan. Additionally, our Operations transformation for Buy is heavily focused on emerging markets.

\*\*\*

[Defendant Barns]: And, finally, consumer data privacy, it's always been a high priority for us, both in the way we design our products and the way we run our operations. We're well prepared for GDPR and we're well positioned in the market.

72.    Thus, although investors were disappointed with the first quarter 2018 results in the Buy segment, specifically in the U.S. market, they were encouraged by growth in Watch and the Company's assurances that it still had access to all of the Facebook data it needed to deliver

its services to clients and that it was on track to meet its guidance of $800 million in free cash flow.

73.     On May 15, 2018, the Company presented at the Needham Emerging Technology Conference.   The presentation was led by Defendant Abcarian.   During the conference Defendant Abcarian was asked whether, in light of increased congressional interest in regulation over consumer privacy and the recent Facebook testimony in front of Congress, Nielsen would continue to have access to the third-party large data sets that fuel its analytics and measurement products delivered to its clients.   Defendant Abcarian stated that because Nielsen only uses aggregated data, as opposed to personal data, even "if the world goes on a complete lockdown tomorrow" Nielsen could still produce the measurement data that advertisers and sellers can use to monetize their inventory:

> [Analyst]: So that brings up this issue of Facebook and testimony in front of the Internet, in front of the Congress?
>
> ***
>
> *How long are you going to be able to bring in all those big data sets before Congress says, "No, no, you're violating somebody's privacy"? And what impact would that have on Nielsen's measurement ability if they can't get these third-party data sets integrated into their own measurement?*
>
> [Defendant Abcarian]: Well, everything we do, we engineer our products using privacy-by-design principles. And our Chief Privacy Officer spends a lot of time understanding regulation and changes in consumer. ***And in fact, whether it was the Facebook or other things, the way in which Nielsen works with these big data providers, we're not looking for respondent-level data.*** We're looking for an ability to create aggregated insights because Nielsen has strong opted-in consumer-compliant panels that we can use the intelligence from in which to basically create the persons-based estimates that are required to drive and fuel the industries.
>
> So I don't – who knows where the industry will go? What I do know is that Nielsen stands in a really strong point because we have invested for 6-plus decades in building high-quality consumer opted-in panels. ***So if the world goes on a complete lockdown tomorrow, Nielsen can still produce measurement in which advertisers and sellers can continue to still monetize their audiences and sell their inventory.***

[Analyst]: And it sounds like the data sets you're bringing in are all nonpersons– they're all non-person, they're big aggregates, so they're not violating data privacy.

[Defendant Abcarian]: Yes. We anonymize – the way in which we work with it, we're never working at an individual respondent level. It's anonymized and aggregated data that we then produce out to the marketplace.

74.     On May 25, 2018, the European Union implemented the GDPR codifying regulation around the collection and usage of personally identifying information, including information that Nielsen had access to and processes from large data sets from Facebook and others to provide analytics services to its clients.

75.     On May 31, 2018, the Company presented at the Sanford C. Bernstein Strategic Decisions Conference. The conference was led by defendant Barns.  During the conference, Defendant Barns was again specifically asked about Nielsen's access to large data sets from third parties like Facebook and the information used for the Company's measurement services. Defendant Barns boasted that Nielsen still had access to "all" the data it needed to provide measurement services and Nielsen was in a better position than other companies that might be affected by privacy changes at Facebook:

[Analyst]: All right. And you mentioned – actually in the 5-year, what might concern you sort of overall, geopolitical and privacy concerns. Certainly for your panel-based solutions, there's really no privacy issue, but – that I can think of, but when you – when I think about, especially, some of the inputs you use for your digital side of your business and your relationship with Facebook in that regard, anything we should be – *anything changing there about your ability to work with Facebook and use their help together to – as an ingredient to how you characterize digital audiences? Anything going on there that we should be thinking about.*

[Defendant Barns:] *For measurement, we still have the access to all the data that we need for our measurement products, including our relationship with Facebook.* I think a reason why we weren't as affected as some other firms who may receive data from Facebook or others is because we've always, historically, taken a fairly conservative approach to how we use data, handle data, manage

data, and that conservative approach served us pretty well in this particular instance. *And so yes, that's been more of a non-event from our side as compared to how it played out for some others.*

In addition, analysts specifically asked Barns whether the Company still had confidence in its ability to deliver $800 million in free cash flow for the fiscal year 2018 and Defendant Barns assured investors that Nielsen was still on track to do so:

> [Analyst]: *How about the fiscal year '18 guide? What comfort can you give, especially regarding the cash flow targets set here*, which is probably somewhat a function of – it seems like some cash went missing in Q1 in particular, or maybe working capital. So the question is, *what comfort can you give regarding this year's cash flow targets. . . .*

> [Defendant Barns]: Yes, first quarter, our free cash flow is in the minus $275 million range. A lot of that reflected the investments we're making associated with retailers and other components of our 3-year plan. And so usually, the first quarter for us is not positive from a free cash flow point, you made that point before. And the prior year was minus $70-ish million, and a bigger number this year reflecting those investments. *Our free cash flow target for the year is $800 million*. Most of our free cash flow historically shows up in the second half of the year and particularly the fourth quarter. *And so that's what we're working on to deliver, and we're on track for that.*

76.     On June 5, 2018, the Company presented at the Robert W. Baird Global Consumer, Technology & Services Conference. During the conference, the Company was asked yet again whether changes to third-party data sets like Facebook would have any impact on the Company's business. And again, the Company assured investors that such policy changes would have no impact on Nielsen's ability to provide revenue-generating measurement data to its clients:

> [Analyst]: Okay. *And then Facebook had a lot of headlines recently. There's been some policy changes there.* Obviously, a big digital marketing platform. It's also a partner in enabling Nielsen digital measurement. *So the changes to their policies, any impact on Nielsen?*

> [Nielsen]: Yes. Look, for more than a decade, we've built our products and services based on privacy by design, which is also fueling kind of the GDPR principles. And everything that we do has been built on those privacy principles into our products and services. When we work with Facebook, the data that we're providing back in the form of measurement is aggregated and anonymized. At no

34

point in time is it ever individualized or respondent level. And all of that is being done in a safe haven environment than anonymization and aggregation. ***And so our product measurements continue to be able to leverage that partnership and execute on the measurement aspects of that because at no means are we producing any kind of respondent-level data against that partnership.***

77.     The statements contained in ¶¶56-60, 62-64, 66-67, 69-73, and 75-76 were materially false and/or misleading when made because Defendants failed to disclose that: (1) Buy segment sales were experiencing a permanent decline due to major budget cuts instituted by the Company's CPG customers; (2) the Company's CPG clients were reducing and cancelling Nielsen custom project work in favor of real-time analytical solutions; (3) the Company recklessly disregarded its readiness for and the true risks of privacy related regulations and policies, including the GDPR, on its current and future financial and growth prospects; (4) the Company's financial performance was far more dependent on Facebook and other third-party large data set providers than previously disclosed and privacy policy changes affected the scope and terms of access Nielsen would have to third-party data; (5) access to Facebook and other third-party provider data was becoming increasingly restricted for Nielsen and its clients; and (6) as a result, the Company's positive statements about its business, operations, and financial conditions lacked a reasonable basis.

78.     Then, on July 26, 2018, Nielsen issued a press release announcing its financial results for second quarter 2018.  The financial results: (i) significantly missed the Company's public net income and free cash flow estimates by a wide margin; and (ii) reduced previously reaffirmed 2018 financial guidance.  The Company placed the blame squarely on the effectiveness of the GDPR which it had assured investors it was "ready for."  In addition, the Company announced it would do a "deep dive" into its "Buy" segment of operations and that CEO and Executive Chairman of the Board Barns would be departing the Company at the end of

2018:

**New York, USA – July 26, 2018 –** Nielsen Holdings plc (NYSE: NLSN) today announced its second quarter 2018 results. The company also announced it is conducting an in-depth strategic review of Nielsen's Buy segment. In a separate release issued today, Nielsen announced that James Attwood would assume the role of Executive Chairman of the Board and Mitch Barns, current CEO, would retire at the end of 2018.

*Revenues were $1,647 million for the second quarter of 2018, up 0.2%, or down 0.7% on a constant currency basis, compared to second quarter of 2017. Net income per share on a diluted basis was $0.20 per share in the second quarter of 2018, compared to $0.37 per share in the second quarter of 2017.*

"In the second quarter, we continued to move forward on our multi-year transformations across Watch, Buy, and Operations. However, *our progress was not reflected in our financial results, which are disappointing and came in below our expectations, and we are lowering our outlook for 2018,"* said Jamere Jackson, Chief Financial Officer of Nielsen.

. . . "In Buy Developed Markets, we saw increased pressure in the fast moving consumer goods end markets; however, we made great progress with the Connected System, retailer initiatives, and Total Consumer Measurement. In Emerging Markets, weakness in multinational client spending was offset by growth with local clients. In Watch, ongoing adoption of Total Audience Measurement continued to drive growth. *However, the General Data Protection Regulation and changes in the consumer data privacy landscape impacted our growth rates in the near-term as clients and partners grapple with the changes and work to ensure compliance."*

### Second Quarter Results

Revenues within the Watch segment for the second quarter of 2018 increased 4.5% to $858 million, or 4.0% on a constant currency basis, compared to the second quarter of 2017. Audience Measurement of Video and Text revenues increased 7.4%, or 6.7% on a constant currency basis, primarily due to our ongoing investments, continued client adoption of our Total Audience Measurement system, and a strong contribution from Gracenote. Audio revenues were flat for the quarter. *Marketing Effectiveness revenues increased 7.2%, or 6.0% on a constant currency basis, driven by consistent investment in our product portfolio and strength in our product initiatives, partly offset by pressure on our clients and partners from the impact of the General Data Protection Regulation (GDPR) and other consumer data privacy considerations. Other Watch revenues decreased by $11 million, or 22.9% on a reported basis and 21.3% on a constant currency basis, due to our continued*

*portfolio pruning. Our Core Watch revenues grew 6.2%, or 5.5% on a constant currency basis.*

Revenues within the Buy segment for the second quarter 2018 decreased 4.1% to $789 million, or 5.4% on a constant currency basis, compared to the second quarter of 2017. . . . *Buy revenues in Developed Markets decreased 4.3%, or 6.9% on a constant currency basis, due to increased pressure on spending from large multinational clients. Revenues within Corporate Buy decreased by $9 million, or 55.6% on a constant currency basis, primarily due to continued portfolio pruning.*

Net income for the second quarter of 2018 *decreased 45.0%* to $72 million, or 45.9% on a constant currency basis, compared to $131 million in the second quarter of 2017, as a result of softer revenues, higher restructuring charges, retailer investments, and other growth initiatives. *Net income per share on a diluted basis was $0.20 per share, compared to $0.37 per share in the second quarter of 2017. During the second quarter of 2018, the company recorded restructuring charges of $65 million, or $0.12 per share.*

Adjusted EBITDA for the second quarter of 2018 *decreased 8.1%* to $468 million, or 8.2% on a constant currency basis, compared to the second quarter of 2017. *Adjusted EBITDA margins contracted 254 basis points to 28.4%, or 232 basis points* on a constant currency basis, due to softer revenue and continued investments in our Buy and Watch segments, partly offset by productivity initiatives.

## Financial Position

\* \* \*

Cash flow from operations increased to $242 million for the second quarter of 2018, from $226 million in the second quarter of 2017. *Free cash flow for the second quarter of 2018 decreased to $124 million, compared to $162 million in the second quarter of 2017. Cash flow performance was driven by lower net income, higher net capital expenditures, higher interest, and tax payments, partially offset by the timing of vendor and client payments.*

\*\*\*

## Strategic Review of Buy Segment

Nielsen's Board of Directors, together with management, is conducting an in-depth strategic review of Nielsen's Buy segment. James Attwood, Executive Chairman, will lead the process, in conjunction with Nielsen's senior management.

79.   The second quarter 2018 press release also issued sharp revisions to revenue, earnings and free cash flow guidance, which was sharply below guidance issued in April 2018 after the first quarter 2018 financial results:

### 2018 Full Year Guidance

Given the first half performance and second half outlook, the company is updating its full year guidance as highlighted below:

|  | Revised | April |
|---|---|---|
| Total Revenue (constant currency basis) | ~(1%) | ~3% |
| Adjusted EBITDA margin growth (constant currency basis) | ~(230)bps | ~(60)bps |
| GAAP net income per share | $0.95 - $1.00 | $1.50 - $1.56 |
| Free cash flow | $550 - $575M | ~$800M |

80.   On that same day, the Company held a conference call for analysts and investors to discuss the disappointing second quarter 2018 results.  In addition to reiterating the financial results and sharply reduced financial guidance, the Company attributed much of the shortfall to the impact of the GDPR.  During the call, Defendant Jackson explained the following:

[Defendant Jackson]: ***On non-GAAP basis, total revenue was down 70 basis points constant*** currency and on an organic basis. Adjusted EBITDA was $468 million, down 8.2% constant currency, and adjusted EBITDA margins were 28.4%, down 232 basis points on a constant currency basis. ***Margins were impacted by softer revenue and continued investments in our Watch and Buy segments.*** This was partly offset by our productivity initiatives. Free cash flow was $124 million, down from a record $162 million a year ago. . . .

. . . The key takeaway is that the fundamentals of our Watch segment remain strong. This includes strong growth in Audience Measurement of Video and Text, the core of our Watch franchise. ***However, we are seeing some short-term pressure from GDPR and privacy changes that are impacting our second quarter results and our 2018 outlook.***

\*\*\*

***Our results are significantly below our expectations as revenues were impacted by GDPR and changes to the consumer data privacy landscape. We have several hundred clients and data partners in this space, and market changes have been disruptive.***

In addition to the effect of the GDPR and changes in the data privacy landscape impacting second quarter 2018 results, the Company explained that it would also cut into the 2018 financial outlook which it had recently reaffirmed:

> [Defendant Jackson]: There are a few dynamics that cause us to have a more conservative outlook for 2018. ***First, the digital advertising ecosystem saw a disruption in the second quarter as large digital platforms made changes to their offerings to increase security for consumer data. Second, we expect operational and policy changes on third-party targeting to contribute to a slowdown in the back half of the year. Third, GDPR and changes in the consumer data privacy landscape is a near-term challenge that has clients and data suppliers working towards compliance as it relates to targeting and data usage rights.*** Now this is a short-term disruption, but it may take some time before the market stabilizes. As such, we're moderating our second half outlook in Marketing Effectiveness accordingly.
>
> ***
>
> To sum up on Watch, the fundamentals of our business remain strong . . . ***however, we expect our second half results to be impacted by the changing consumer data privacy landscape, as I mentioned, and we're lowering our 2018 Watch revenue outlook to approximately 2.5% growth on a constant currency basis.***

The Company also provided more details concerning its in-depth strategic review of its Buy segment, stating in relevant part:

> [Defendant Jackson]: Turning to Buy, the key takeaway is that the ***pressure in the fast-moving consumer goods industry among global multinationals does not show signs of abating in the near term. We're now seeing this in both Developed and Emerging Markets which impacted our 2Q results and 2018 outlook.*** We are focused on our key initiatives to drive improved results over time despite the environment.
>
> Second quarter total Buy revenue was $789 million, down 5.4% on a constant currency basis and organically. Our revenue in the Developed Markets was $488 million, down 6.9% constant currency behind increased weakness from global multinationals. Our business in the Emerging Markets was also impacted by weakness in global multinationals. Revenue was $293 million, up 30 basis points constant currency.
>
> ***
>
> ***As a result of the increased pressure in the Buy segment, we are lowering our 2018 revenue outlook to negative 4.5%*** on a constant currency basis.

81. On this news, Nielsen's stock price fell $7.46 per share, or more than 25 percent, to close at $22.11 per share on July 26, 2018, on heavy volume trading.

82. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

83. During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

84. The Individual Defendants permitted Nielsen to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.

85. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Nielsen, their control over, receipt, and/or modification of Nielsen's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Nielsen, participated in the fraudulent scheme alleged herein.

86. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Nielsen common stock by disseminating materially false and misleading statements and/or concealing material adverse

facts. The scheme deceived the investing public regarding Nielsen's business, operations, and management and the intrinsic value of Nielsen common stock and caused Plaintiff and members of the Class to purchase Nielsen common stock at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

87. During the Class Period, as detailed herein, Nielsen and Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Nielsen common stock, and operated as a fraud or deceit on Class Period purchasers of Nielsen common stock by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Nielsen common stock declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Nielsen common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

88. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Nielsen common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

89.     At all relevant times, the markets for Nielsen common stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, Nielsen filed periodic public reports with the SEC;

(b)     Nielsen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Nielsen was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Nielsen common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "NLSN."

90.     As a result of the foregoing, the market for Nielsen common stock promptly digested current information regarding Nielsen from publicly available sources and reflected such information in Nielsen's stock price.  Under these circumstances, all purchasers of Nielsen common stock during the Class Period suffered similar injury through their purchase of Nielsen common stock at artificially inflated prices and the presumption of reliance applies.

91.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of

reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## NO SAFE HARBOR

92.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Nielsen who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Nielsen common stock between February 11, 2016 and July 25, 2018, inclusive (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Nielsen, and the directors and officers of Nielsen and their families and affiliates at all relevant times.

94. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of June 30, 2018, Nielsen had 355,207,609 shares of common stock outstanding.

95. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the Exchange Act was violated by Defendants;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of Nielsen common stock was artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

96. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

97. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation. Plaintiff has no interests that conflict with those of the Class.

98.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### CLAIMS FOR RELIEF

### COUNT  I
**For Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

99.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Nielsen common stock during the Class Period.

102.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nielsen common stock.  Plaintiff and the Class would not have purchased Nielsen common stock at the prices they paid, or at all, if they

had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

103.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Nielsen common stock during the Class Period.

**COUNT  II**
**For Violation of Section 20(a) of the Exchange Act**
**<u>Against the Individual Defendants</u>**

104.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.    The Individual Defendants acted as controlling persons of Nielsen within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Nielsen, the Individual Defendants had the power and ability to control the actions of Nielsen and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.    Awarding Plaintiff and the members of the Class damages and interest;

C.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury.

DATED:  September 21, 2018

*/s/ Michael D. Smith*
Michael D. Smith
**THE LAW OFFICE OF MICHAEL D. SMITH, P.C**
Michael D. Smith
53 West Jackson Boulevard
Suite 1663
Chicago, Illinois 60604
Tel:  (312) 546-6138
Fax:  (888) 664-8172
Email:  msmith@smithlawchicago.com

*Local Counsel for Plaintiff Plumbers and Steamfitters Local 60 Pension Trust*

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: ckeller@labaton.com
          ebelfi@labaton.com
          fmcconville@labaton.com

*Counsel for Plaintiff Plumbers and Steamfitters Local 60 Pension Trust*